Zygmunt **OLINSKI**, Plaintiff,

v.

The **NEW YORK CENTRAL RAILROAD COMPANY** and United States of America, Defendants.

Civ. A. No. 6180.

United States District Court
W. D. New York.

Oct. 19, 1956.

**24**

William J. Fredel, Buffalo, N. Y., Richard C. Machcinski, New York City, of counsel, for plaintiff.

Brown, Kelly Turner & Symons, Buffalo, N. Y., John L. Leach, Buffalo, N. Y., of counsel, for The New York Cent. R. Co.

MORGAN, District Judge.

This is an action brought under the Federal Employers' Liability Act (Title 45 U.S.C.A. § 51 et seq.) against the defendant employer for the basic reason alleged that it did not provide the plaintiff with a safe place to work; and against the defendant, United States, on the basic ground that the government, through the Postal Department, was negligent in failing to properly supervise the lacing cord on mail bags handled by the railroad.

The plaintiff, 42 years of age, married and a father, worked for the defendant-railroad company since 1928. For five and one-half years, he was in the service of the defendant, New York Central Railroad, as a mail and baggage trucker. He possessed thirteen to fourteen years seniority and worked steadily, except for a period of time when he was in the Armed Services. He claimed to have had no other accidents, injuries or illnesses. Following his discharge from the Armed Services on August 31, 1945, plaintiff made no application for service connected disability. After the accident, he was hospitalized from August 30, 1952 to September 17, 1952. He helped his father-in-law in day to day cleaning of a rooming house until January 18, 1955. He did not remember what his father-in-law paid him. He purchased a delicatessen store where, he testified, he "did what work he could after the accident." He also testified that he got supplies for the delicatessen with a station wagon and worked around the store five days a week when his leg didn't hurt him. In addition, plaintiff worked for the railroad from January 18, 1955 to the latter part of June, 1955, when he changed his work. He then worked on a conveyor, or chute, to a sorting table

for an undisclosed period of time. He lost considerable time because of treatment or inability to work as a result of the accident. Plaintiff's exhibit 4 shows that he earned approximately $230 per month for the year prior to the accident, whereas after the accident, he had a $60.75 per week income.

In 1951, plaintiff was assigned to the task which he was doing when the accident occurred on August 30, 1952. His employment was in the Buffalo terminal of the New York Central Railroad Company. A baggage car would be drawn alongside of the platform, which was an extension of part of the freight depot of the defendant, New York Central Railroad Company. This platform, on the north side of the car, ran in an easterly and westerly direction. It was approximately five and one-half feet wide. Immediately to the south of the platform was a set of tracks, and north of the car placed thereon were two parallel tracks. The platform was known as a high dock, and it appears that dollies, or trucks as they are ordinarily known, would be brought to the high dock by employees of the Postal Department of the United States government. The dollies were taken to the open door of the baggage car and one, or both, of the two wheels closest to the car placed in the space between the car and the platform in such a way as to tip the dolly sideways and into the car. The sacks were removed by the railroad workers, including the plaintiff, and piled within the car, previous to its removal. The evidence indicated no particular method of instruction was given plaintiff and others doing the same type of work, other than not to handle the mail recklessly. Baling hooks were not used by the railroad and were, in fact, prohibited by United States postal regulations.

When filled, as shown in plaintiff's exhibit 3, the mail bag weighed from seventy-five to eighty pounds, according to the testimony, although both counsel requested that the court take judicial notice that they sometimes weigh over one hundred pounds.

There was about a one foot space between the edge of the platform and the car. There were ten to fifteen sacks on this particular dolly, piled on top of each other. The method of releasing them was to pull hard to dislodge them from each other. The car itself was stipulated to be nine feet wide and had four sliding doors. At the car where the plaintiff was working on the evening in question, there was a single door six feet wide toward the platform and the opposite door, known as a double, was eight feet two inches wide. At the other end of the car were two doors in reverse position, the closed single door on the track side and the open double door at the platform side. It appears that these mail bags are made of heavy canvas, approximately three feet in length and two feet in width. After the mail sack is locked, the two ends of the lacing cord dangle loosely below a movable metal lever.

The plaintiff testified that he worked on the night in question from 11 p. m. to 7 a. m. and that about forty-five minutes to an hour before the accident, he was told to put mail sacks in the car in question, bearing No. 8915. Various employees of the railroad testified that they usually tell handlers of mail on the first day of employment that, if the sack is too heavy, to ask for help. No specific instructions are given. Some witnesses testified that it was the custom and practice to handle the sacks by using the lacing cord; others, that they customarily grab the top of the bag to pull it off the dolly, then use the strings to drag it, but not to lift it. Postal regulations against using the lacing cords or neck cords were apparently uniformly disregarded. The nearest estimate was that there were one hundred to one hundred fifty bags in this particular car, which would hold between four hundred fifty and five hundred bags.

After lifting three or four bags from the platform edge of the car, which plaintiff said he did by pulling each in an upright position by the lacing cord, on either the third or fourth bag he felt a rope snap. He felt it in his arms at

the time when he was in the center of the car, as indicated by his mark on defendant's exhibit A and B. That, the plaintiff testified, was the last he remembered. No evidence was adduced as to how he arrived on the track through the open door opposite the platform, but there is no doubt that he did. In so doing, he sustained serious injuries.

As a final factual statement, postal regulations exist against opening these bags. The common carrier cannot refuse to take the mail. It was in the discretion of the individual trucker, or handler, as to how to handle the bag. There frequently were damaged bags, as well as frayed lacing cords, which the government repaired. There was a standing order that if any bag was damaged and it was noticed by any employee of the railroad, postal regulations required that such bag be turned over to the transfer clerk. No evidence was adduced as to any government or railroad regulation about open doors away from platforms. It was permissible for the workman to open them or not. No witness in this case, including the plaintiff, gave evidence as to who closed the door, who opened the door, and the plaintiff himself did not know whether it was open or closed when he went on duty. The mail sacks on the dolly, from which the one in question was taken, were filled with empty mail sacks which had just been returned from the agency of the Post Office Department where repairs were made. The plaintiff predicates the claim of negligence on the frayed cord and the open door. During the trial, plaintiff's claim against defendant, United States, was settled for $10,000, the plaintiff reserving his right to proceed against the defendant, New York Central Railroad.

■■ Certain collateral claims were made by the plaintiff against the railroad which were not proved. The charge that car No. 8015 was not properly illuminated was not sustained. The charge of failure of inspection was a conclusion. Dugan v. American Transfer Co., 160 App.Div. 11, 145 N.Y.S. 31.

The plaintiff testified that he grasped these heavy sacks by one cord from time to time; as to this particular sack, he was not definite as to whether he had one or two cords in this hand as he brought it upright. It is apparent, from an examination of plaintiff's exhibit 2, that only one cord was broken. There is no evidence that the defendant-railroad company could have inspected, or if it had inspected, would have discovered where that break occurred. Objection was made to the receipt of plaintiff's exhibit 2 on the ground that plaintiff had not sufficiently identified it as the bag in question. That objection is overruled. The last collateral claim by plaintiff of negligence on the part of the defendant-railroad company is lack of supervision. It is our opinion that supervision would not have caused the plaintiff to close the westerly door on the southerly side. It was a warm humid evening and the open doors, other than the one through which the mail was being loaded, were open, if and when they were opened, for ventilation.

■■ Section 51 of Title 45 U.S.C.A. has been a subject of much litigation. So far as pertinent, the language applicable to this case reads "Every common carrier * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." While this sounds like it was the intention of Congress to make it a workman's compensation law, it is well settled that "in order to recover under the Federal Employers' Liability Act, it was incumbent upon petitioner to prove that respondent was negligent and that such negligence was the proximate cause in whole or in part of the fatal accident. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 63 S.Ct. 444, 451 [87 L.Ed. 610]." In citing this case, in Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 32, 64 S.Ct. 409, 411, 88 L.Ed. 520, the court said, "Petitioner was required to present probative facts from which the negligence and the causal relation could reasonably be inferred." Citing Galloway v. U. S., 319 U.S. 372,

395, 63 S.Ct. 1077, 87 L.Ed. 1458, wherein the court said, "the essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attached." The assumption of risk doctrine of the earlier statute, as a defense where there is negligence, has been written out of the Act and the doctrine of comparative negligence has replaced it.

 The basis of action under the present act remains the carrier's negligence. True, the carrier is not relieved from the consequences of its negligence by a claim that the employee "assumed the risk" of his employment; but neither is the carrier to be charged with those injuries which it could not avoid in the exercise of its duty of reasonable care. As Mr. Justice Douglas said in Wilkerson v. McCarthy, 336 U.S. 53, at page 69, 69 S.Ct. 413, at page 421, 93 L.Ed 497, "The basis of liability under the Act is and remains negligence. Judges will not always agree as to what facts are necessary to establish negligence." He then proceeds to show that the trend of judicial decision in the Federal Courts is largely in favor of the workman. And yet, our own Circuit Court in Cahill v. New York, New Haven & Hartford R. Co., 2 Cir., 224 F.2d 637, at page 638, has said "The duty to provide a railroad employee with a safe place to work is not an absolute duty; if it were the employer would be an insurer of the employee's safety and negligence would be irrelevant. Under the Federal Employer's Liability Act, the employer's duty is the same as imposed by the common law, namely, to use reasonable care in furnishing his employees with a safe place to work." citing Bailey v. Central Vermont Ry., 319 U.S. 350, 352, 63 S.Ct. 1062, 87 L.Ed. 1444. "All work on a railroad involves some danger, but it has to be done and the dangers involved do not involve liability, provided the railroad takes all practicable precautions consistent with the conduct of the business." Paraphrasing the language in Wadiak v. Illinois Cent. R. Co., 7 Cir., 208 F.2d 925, if, for the purposes of this decision, we indulge the presumption that there is evidence of negligence on the part of the defendant, there is not an iota of proof that it was the proximate cause of plaintiff's injuries. He was not injured because he did not have equipment, but because he saw fit to work as he did, with an open door behind him, for his own convenience. He had a choice of methods, he could work with an open or closed door. "Nothing was done by the defendant causing the injury incurred in his voluntary choice of how best to do his duty. The law imposes no liability under such circumstances." Nor is this reasoning overcome by that in Masiglowa v. New York, Chicago & St. Louis R. Co., D.C., 135 F.Supp. 816 or Stone v. New York Central & St. Louis R. Co., 344 U.S. 407, 73 S.Ct. 358, 97 L. Ed. 441, since that line of cases holds that appraisal of the facts should be left to the jury. In this case, the court, as trier of the law and the facts, is not satisfied that the defendant-railroad company is guilty of negligence in that it knew, or by the exercise of due care should have known, that prevalent standards of conduct were inadequate to protect the plaintiff and similarly situated employees under the reasoning of Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282. As has frequently been said, each case is determined upon its own facts. Plaintiff failed to meet the burden of proving defendant's negligence by credible evidence. From the evidence in this case, as a whole, neither negligence nor proximate causal relation can be reasonably inferred. For these reasons, Patterson v. Pennsylvania Railroad Co., 2 Cir., 197 F.2d 252 is not considered as controlling.

Judgment may be entered in favor of the defendant, The New York Central Railroad Company, without costs.